IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Pacira BioSciences, Inc.,<br><br>      Plaintiff,<br><br>  v.<br><br>Nephron Sterile Compounding Center, LLC and W. Bradley Worthington,<br><br>      Defendants. | C/A No. 3:23-cv-05552-CMC |

**ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' CROSS-**

**MOTIONS FOR SUMMARY JUDGMENT [169, 170] AND DENYING DEFENDANTS'**

**MOTION TO EXCLUDE THE EXPERT REPORT OF SARAH BUTLER [163]**

**TABLE OF CONTENTS**

I.   BACKGROUND ...........................................................................................................3

    A.   Legal Background.............................................................................................3

    B.   Factual Background ..........................................................................................6

II.  LEGAL STANDARD ..................................................................................................9

III. DISCUSSION.............................................................................................................10

    A.   The Lanham Act .............................................................................................10

    B.   Defendants' Threshold Arguments .................................................................14

        1.   The doctrine of laches bars Count I............................................................14

        2.   The RKK Compliance Statements are not statements of opinion .............19

        3.   The FDCA does not preclude Pacira's challenge to the RKK Compliance Statements...................................................................................................23

        4.   The court will limit its analysis to the statements identified in Count II of the Complaint...............................................................................................27

    C.   Merits of Count II ...........................................................................................32

        1.   Falsity .......................................................................................................32

            a.   RKK Compliance Statements.........................................................33

                i.   Listing RKK as a "503B Product"......................................33

                ii.   Nephron is "a leading manufacturer of 503B outsourcing products".................................................................................34

                iii.   Nephron's "503B outsourcing facility" logo .....................36

            b.   RKK Comparison Statements.........................................................44

            c.   RKK Safety and Efficacy Statements............................................45

        2.   Materiality.................................................................................................47

        3.   Deception...................................................................................................48

        4.   Interstate commerce...................................................................................49

        5.   Injury.........................................................................................................50

IV.  CONCLUSION...........................................................................................................51

Pacira BioSciences, Inc. ("Pacira") manufactures and sells an FDA-approved drug called EXPAREL.  It claims that Nephron Sterile Compounding Center, LLC ("Nephron") and W. Bradley Worthington ("Dr. Worthington") made various false and misleading statements about two of Nephron's compounded drug products.  In particular, Pacira alleges that Nephron and Dr. Worthington represented those products as compliant with Section 503B of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–399j, and as safe, effective, and superior to EXPAREL. Believing these statements caused it to lose sales of EXPAREL, Pacira sued Nephron and Dr. Worthington for violating the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Now before the court are the parties' competing motions for summary judgment and Defendants' motion to exclude the report of Pacira's survey expert, Sarah Butler.  Dkt. Nos. 163, 169, 170.  For the reasons explained below, the court denies Defendants' motion to exclude and grants in part and denies in part both cross-motions for summary judgment.

## I.     BACKGROUND

### A.     Legal Background

In the fall of 2012, the New England Compounding Center ("NECC") in Framingham, Massachusetts, distributed more than 17,000 vials of a contaminated steroid to healthcare facilities in 23 states.  What followed was a nationwide fungal meningitis outbreak that killed 64 patients and sickened hundreds more.  Press Release, U.S. Dep't of Just., *Owner of New England Compounding Center Convicted of Racketeering Leading to Nationwide Fungal Meningitis Outbreak* (Mar. 22, 2017), https://www.justice.gov/archives/opa/pr/owner-new-england-compounding-center-convicted-racketeering-leading-nationwide-fungal (describing the outbreak as "the largest public health crisis ever caused by a pharmaceutical product").

Congress responded to the NECC disaster by passing the Drug Quality and Security Act ("DQSA"), 113 Pub. L. No. 54, 127 Stat. 587 (2013). Among other things, the DQSA added Section 503B to the Federal Food, Drug, and Cosmetic Act ("FDCA") and created a new type of FDA-regulated entity called an "outsourcing facility." Section 503B defines an "outsourcing facility" as a facility that "is engaged in the compounding of sterile drugs"; "has elected to register as an outsourcing facility"; and "complies with all of the requirements of [Section 503B]." 21 U.S.C. § 353b(d)(4)(A)(i)–(iii). Such facilities may distribute compounded drugs without obtaining a patient-specific prescription. *Id.* § 353b(d)(4)(C). They are also exempt from the FDCA's new-drug approval process and certain labeling and supply-chain requirements. *Id.* § 353b(a). But to qualify for these exemptions, an outsourcing facility must first satisfy 11 statutory "conditions." *Id.*

One of those conditions, and the one central to this case, restricts outsourcing facilities' use of "bulk drug substances" in compounding.[1] It provides that a compounded drug must be

> compounded in an outsourcing facility that does not compound using bulk drug substances . . . , unless—
>
> > (A)(i) the bulk drug substance appears on a list established by the Secretary identifying bulk drug substances for which there is a clinical need, by—
> >
> > > (I) publishing a notice in the Federal Register proposing bulk drug substances to be included on the list, including the rationale for such proposal;
> > >
> > > (II) providing a period of not less than 60 calendar days for comment on the notice; and

---

[1] A "bulk drug substance" is considered "any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body." 21 C.F.R. §§ 207.1, 207.3.

4

(III) publishing a notice in the Federal Register designating bulk drug substances for inclusion on the list; or

(ii) the drug compounded from such bulk drug substance appears on the drug shortage list in effect under section 506E at the time of compounding, distribution, and dispensing . . . .

*Id.* 353b(a)(2)(A)(i)–(ii).  In short, the provision permits an outsourcing facility to compound with a bulk drug substance in two limited circumstances: when the substance appears on the clinical need list, or when the drug compounded from it appears on the drug shortage list in effect at the time of compounding, distribution, and dispensing.

In 2016, the FDA issued guidance outlining its "interim regulatory policy regarding outsourcing facilities that compound . . . using bulk drug substances while the [clinical need] list [was] being developed."  U.S. Food & Drug Admin., *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act Guidance for Industry*, 2016 WL 3357247, at *1 (June 2016) [hereinafter "Interim Bulk Drug Policy"].  The FDA explained it had received nominations for more than 2,500 substances and was still evaluating which ones merited inclusion on the list.  *Id.* at *3, *4.  So to avoid "unnecessary disruption to patient treatment" in the meantime, the agency announced it did "not intend to take action against" an outsourcing facility that failed to comply with Section 503B's bulk drug substance provision, provided certain conditions were met.  *Id.* at *5.  Most important, the substance used by the facility had to appear on a list of "Category 1" substances the FDA maintained on its website.  *Id.* at *6. The FDA defined Category 1 substances as those that "may be eligible for inclusion on the [clinical need] list, were nominated with adequate supporting information for FDA to evaluate them, and [had] not been identified by FDA as presenting significant safety risks."  *Id.* at *7.

5

### B.     Factual Background

Pacira describes itself as "a leading provider of non-opioid pain management solutions." Dkt. No. 25 ¶ 5.  It manufactures and markets EXPAREL, an FDA-approved non-opioid analgesic used to treat postsurgical pain.  *Id.* ¶¶ 6–7.  EXPAREL consists of bupivacaine, a local anesthetic, encapsulated in multivesicular liposomes that release the drug slowly over time.  Dkt. 160-2 at 7.[2] Since its launch in 2012, EXPAREL has been used by more than 16.5 million patients and has become Pacira's largest revenue-generating product.  *Id.* at 9.

Nephron is an outsourcing facility registered with the FDA under Section 503B of the FDCA.  Dkt. No. 170-13 ¶ 3.  In December 2018, it began selling BKK, a compounded drug product consisting of bupivacaine, ketorolac, and ketamine.  Dkt. Nos. 170-13 ¶ 12; 169-8 at 3. BKK was created by Dr. Worthington, who licensed it to Nephron for distribution.  Dkt. Nos. 169-8 at 3–4; 170-13 ¶ 8.  Nephron launched a similar compounded product, RKK, in July 2019.  Dkt. No. 170-13 ¶ 13.  Like BKK, RKK was made with ketorolac and ketamine, but it substituted ropivacaine for bupivacaine.  Dkt. No. 169-8 at 6.  Throughout the period both drugs were on the market, Nephron advertised and sold them as "503B products" and as lower-cost alternatives to Pacira's EXPAREL.  *See, e.g.*, Dkt. Nos. 160-2 at 16–40; 169-7 at 9; 169-21 at 3.

In August 2019, Pacira wrote to the FDA urging it to take action against Nephron over its "illegal marketing and promotion" of BKK.  Dkt. No. 170-2 at 15.  Pacira's letter advanced three principal arguments.  First, Pacira argued Nephron's compounding did not comply with Section 503B because (1) no "co-packaged bupivacaine, ketorolac and ketamine injection product"

---

[2] Citations to page numbers refer to the document's PDF pagination.

appeared on the drug shortage list[3] and (2) the individual components of BKK were not on the clinical need list. *Id.* at 17, 19. As a result, Pacira maintained, BKK fell outside the sole exemption allowing its sale without FDA approval, making it an "unapproved new drug" sold in violation of the FDCA. *Id.* at 22. Second, Pacira asserted that BKK was misbranded. It pointed to a Nephron press release describing BKK as an "opioid sparing" product that "allows for a lower cost of care, diminished risk of readmission and higher patient safety outcomes." *Id.* Pacira argued this statement rendered BKK misbranded because Nephron offered no support for its claims and because the statement "misleadingly suggest[ed] that other products are less safe, less effective and otherwise inferior to BKK." *Id.* at 22–23. Finally, Pacira warned that BKK posed "a significant risk to patient safety," as the FDA had never assessed whether bupivacaine, ketorolac, and ketamine were safe to use in combination. *Id.* at 23–24. Pacira wrote to the FDA several more times complaining about BKK before Nephron stopped selling the product in July 2022.[4] *Id.* at 34–37, 58–61, 63–64.

In November 2023, Pacira initiated this action against Nephron. Dkt. No. 1. Pacira later amended its complaint in February 2024, adding Dr. Worthington as a defendant. Dkt. No. 25. The operative amended complaint (the "Complaint") asserts two claims for false advertising under the Lanham Act. Count I concerns Nephron's marketing of BKK and is asserted against both Defendants. It alleges Nephron and Dr. Worthington made a range of false or misleading statements about BKK, including that:

---

[3] Nephron originally sold BKK as a kit of three pre-filled syringes (one for each drug) but switched in early 2019 to a single syringe combining all three. RKK, by contrast, was always sold in a single syringe.

[4] Nephron stopped selling RKK the same month.

(1) BKK is compounded in compliance with Section 503B;

(2) BKK is compounded in a 503B-compliant outsourcing facility;

(3) BKK is generic to or substitutable for EXPAREL;

(4) BKK is more "efficacious for long term analgesia" and "post operative pain" than EXPAREL;

(5) EXPAREL "does not deliver the analgesic and antiemetic benefits of BKK";

(6) BKK "improves patient safety, satisfaction, recovery time, patient outcomes" and "patient experience"; and

(7) BKK "reduces postoperative pain, complications, risk of readmission, length of stay, [and] patient morbidity and mortality."

*Id.* ¶ 162. The court refers to statements (1) and (2) as the "BKK Compliance Statements," statements (3), (4), and (5) as the "BKK Comparison Statements," and statements (6) and (7) as the "BKK Safety and Efficacy Statements."

Count II concerns Nephron's marketing of RKK and is asserted against Nephron alone. It alleges Nephron made a similar set of false or misleading statements about RKK, namely that:

(8) RKK is compounded in compliance with Section 503B;

(9) RKK is compounded in a 503B-compliant outsourcing facility;

(10) RKK is generic to or substitutable for EXPAREL;

(11) RKK provides "improved value" over EXPAREL;

(12) RKK "reduces post-operative pain[,] complications, risk of readmission, length of stay, [and] patient morbidity and mortality";

(13) RKK "eliminates opioid related adverse drug effects"; and

(14) RKK has "low reported incidents of nausea and vomiting."

8

*Id.* ¶ 168.[5]   The court refers to statements (8) and (9) as the "RKK Compliance Statements," statements (10) and (11) as the "RKK Comparison Statements," and statements (12), (13), and (14) as the "RKK Safety and Efficacy Statements."

On May 18, 2026, the parties filed the instant cross-motions for summary judgment. Dkt. Nos. 169, 170.  Pacira moves for partial summary judgment as to liability, while Defendants move for summary judgment as to liability and damages.  Both motions have been fully briefed and are ripe for review.  Dkt. Nos. 181, 183, 204, 206.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law."  *Milla v. Brown*, 109 F.4th 222, 228 (4th Cir. 2024) (internal quotation marks omitted).  In ruling on a motion for summary judgment, the court views "all facts and reasonable inferences in the light most favorable to the nonmoving party."  *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings"

---

[5] The Complaint also alleges that Defendants falsely advertised BKK and RKK as "FDA-approved" and "produced in an FDA-approved facility," but the court dismissed Pacira's claims based on those statements at the pleading stage.  Dkt. No. 55 at 28.

9

and come forward with "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To withstand summary judgment, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

When, as here, the parties have filed cross-motions for summary judgment, the court "consider[s] each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (internal quotation marks omitted). In doing so, the court "resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal quotation marks omitted).

## III.     DISCUSSION

The court's discussion proceeds in three parts. First, the court outlines the legal framework governing false-advertising claims under the Lanham Act. Second, the court addresses several threshold arguments raised by Defendants. Finally, the court considers whether Pacira can establish a Lanham Act violation as to any of the statements it challenges.

### A.     The Lanham Act

Section 43(a) of the Lanham Act imposes liability on "[a]ny person who . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To prevail on a claim of false advertising under the Lanham Act, a plaintiff must prove five elements:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;

(2) the misrepresentation is material, in that it is likely to influence the purchasing decision;

(3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;

(4) the defendant placed the false or misleading statement in interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298–99 (4th Cir. 2017) (internal quotation marks omitted). Importantly, when a claim involves multiple statements, a plaintiff "may not mix and match statements, with some satisfying one Lanham Act element and some satisfying others." *Id.* at 299. "Rather, at least one statement must satisfy all five elements to constitute a Lanham Act violation." *De Simone v. Alfasigma USA, Inc.*, 847 F. App'x. 174, 182 (4th Cir. 2021).

With respect to the first element, a plaintiff can demonstrate falsity in one of two ways. *In re GNC Corp.*, 789 F.3d 505, 514 (4th Cir. 2015). First, the plaintiff can show that the challenged statement was "literally false." *Id.* "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002) (internal quotation marks omitted). But "only an unambiguous message can be literally false." *Id.* at 275–76 (citation modified). Thus, statements that are "susceptible to more than one reasonable interpretation" will not suffice. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007); *see also Scotts Co.*, 315 F.3d at 275 (rejecting

literal falsity argument where graphic could "reasonably be understood as conveying different messages").

"A plaintiff's burden in proving literal falsity . . . varies depending on the nature of the challenged advertisement." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992). Some advertisements convey what are known as "establishment" claims, while others convey "non-establishment" claims. *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 435 & n.2 (4th Cir. 1997). "When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is test or study-validated" — i.e., an establishment claim — "the fact of the validation becomes an integral and critical part of the claim." *Id.* at 435 (citation modified). "Such a claim may . . . be proven literally false by showing only that the test asserted to validate it did not in fact do so." *Id.*; *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002) ("To prove an establishment claim literally false, the movant must 'prove that these tests did not establish the proposition for which they were cited.'" (quoting *Quaker State*, 977 F.2d at 63)). Conversely, "where the claim is made baldly, with no assertion of test or study validation" — i.e., a non-establishment claim — the plaintiff must affirmatively prove that "the favorable fact baldly asserted is false." *C.B. Fleet*, 131 F.3d at 435. "The relevant question for determining the required proof is whether the advertisement made an assertion of test-validation to the consumer public." *Id.* at 436.

The second way to demonstrate falsity is by showing that the statement is "impliedly false," meaning that the statement, "although literally true, [is] likely to mislead and to confuse consumers." *Id.* at 434 (internal quotation marks omitted). To prevail on an implied falsity theory, a plaintiff must come forward with extrinsic evidence (usually in the form of consumer surveys) establishing that "the advertising tends to deceive or mislead a substantial portion of the intended

12

audience." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (internal quotation marks omitted).  Such evidence must "account for the . . . allegations in the case — or, show that the statement misled consumers in the way the plaintiff claims it did; otherwise, it fail[s] to provide the required evidence of [implied] falsity." *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501–02 (4th Cir. 2015) (internal quotation marks omitted).

This requirement does not apply, however, to literally false statements.  When a statement is literally false, "deception of the purchasing audience is presumed." *De Simone v. VSL Pharms., Inc.*, 395 F. Supp. 3d 617, 628 (D. Md. 2019); *Scotts Co.*, 315 F.3d at 273 ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception." (internal quotation marks omitted)).

Regardless of whether a plaintiff proceeds on a theory of literal or implied falsity, it must also show that the defendant's misrepresentation was material.[6]  Materiality, in effect, "asks whether the false statements were of the kind that would likely influence a relevant buyer's

---

[6] There is a split among the circuits over whether a finding of literal falsity relieves the plaintiff of its burden to prove materiality.  The Fifth Circuit has held that a literally false statement triggers a presumption of materiality, *see Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000), while the First, Second, Eighth, and Eleventh Circuits hold that a plaintiff must demonstrate materiality even when a statement is literally false, *see Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002); *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 67–68 (2d Cir. 2016); *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 939–40 (8th Cir. 2021); *Johnson & Johnson*, 299 F.3d at 1250–51.

Although the Fourth Circuit does not appear to have directly addressed the issue, the court agrees with the majority view.  Just because a statement is false does not automatically mean it is likely to influence purchasing decisions — a false statement may concern something that is inconsequential to consumers.  *See, e.g.*, *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 257 (9th Cir. 1995) (holding that a distributor's false representation that it had filed three — rather than two — lawsuits against sellers of competing products was "unlikely to influence pharmacists' purchasing decisions" because "the message that [the distributor] was willing to defend its intellectual property rights . . . would be the same in either case").

purchasing decision." *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 803 F. Supp. 3d 346, 402 (D. Md. 2025) [hereinafter *GWA III*]. Factors bearing on materiality include "the importance of the thing which is misrepresented," "how [the] misrepresentation [was] used," and "the extent to which [the] misrepresentation depart[ed] from the facts." 4 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 27:35 (5th ed. 2026).

Finally, to establish the injury element of a false-advertising claim, "a plaintiff must . . . prove[] an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). In other words, a false-advertising plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Id.* at 133. That type of injury typically "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.*; *see also id.* at 138 (describing "diversion of sales to a direct competitor" as the "paradigmatic direct injury from false advertising").

## B.     Defendant's Threshold Arguments

With the above principles in mind, the court turns to the threshold arguments raised by Defendants. Specifically, Defendants contend that (1) Pacira's claims are barred by laches; (2) the BKK and RKK Compliance Statements are nonactionable statements of opinion; (3) the FDCA precludes Pacira's claims based on the BKK and RKK Compliance Statements; and (4) certain statements on which Pacira now relies cannot be considered because they were not pleaded in the Complaint. The court considers each argument in turn.

### 1.     The doctrine of laches bars Count I

Defendants first argue Pacira's claims are barred by laches because Pacira knew about their alleged false advertising of BKK since at least August 2019 and has failed to rebut the presumption

14

of prejudice arising from its more than four-year delay in filing suit. Dkt. Nos. 170-1 at 51–52; 206 at 4–7. As explained below, the court agrees with Defendants in part: laches bars Count I — but not Count II.

The Lanham Act does not contain its own statute of limitations, so determining whether a claim is barred due to a delay in filing depends on the equitable doctrine of laches. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 293–94 (4th Cir. 2021). Laches "generally applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights." *PBM Prods.*, 639 F.3d at 121. A party asserting laches must establish both "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961).

The starting point in a laches analysis is the most analogous state statute of limitations. *See Design Gaps, Inc. v. Distinctive Design & Constr. LLC*, 162 F.4th 452, 482–83 (4th Cir. 2025). If the plaintiff sued outside the relevant limitations period, both elements of laches are "strongly presumed." *PBM Prods.*, 639 F.3d at 121; *Belmora*, 987 F.3d at 294 ("Laches is presumed to bar § 43(a) claims filed outside the analogous limitations period."). The defendant retains the ultimate burden of proving prejudice, but it "may either rest on the inference [of prejudice] alone or introduce additional evidence." *Giddens v. Isbrandsten Co.*, 355 F.2d 125, 128 (4th Cir. 1966). The plaintiff may then attempt to rebut the presumption of laches "by explaining the reasons for the delay or demonstrating lack of prejudice." *Dameron v. Sinai Hosp. of Baltimore, Inc.*, 595 F. Supp. 1404, 1416 (D. Md. 1984); *Giddens*, 355 F.2d at 128 ("The plaintiff is then to be heard to excuse his apparent laggardness and to prove facts manifesting an absence of actual prejudice."); *see also Fretwell v. Gillette Safety Razor Co.*, 106 F.2d 728, 731 (4th Cir. 1939) ("[W]hen . . . suit

is brought after the statutory time has elapsed, the burden is on the complainant to show . . . that it would be inequitable to apply [laches] to his case.").

Here, "South Carolina's three-year statutes of limitations for fraud and unfair trade practices supply the analogous limitations period." *Design Gaps*, 162 F.4th at 483 (citing S.C. Code Ann. §§ 15-3-530(7), 39-5-150). Pacira filed this lawsuit on November 1, 2023. So, if Pacira "knew or should have known that it had a viable claim for [false advertising]" before November 1, 2020, the presumption of laches applies. *Id.* at 483 & n.12 (internal quotation marks omitted).

The undisputed facts show Pacira knew it had a viable claim well before that date. In August 2019, Pacira wrote to the FDA complaining about Nephron's "illegal marketing and promotion" of BKK. Dkt. No. 170-2 at 15. It maintained Nephron's compounding of BKK did not comply with Section 503B and that Nephron had made "false or misleading claims regarding the product's efficacy, safety and 'opioid sparing' nature." *Id.*; *see also id.* at 22 (contending that a Nephron press release "misleadingly suggest[ed] that other products [were] less safe, less effective and otherwise inferior to BKK"). These are essentially the same theories underlying Count I of the Complaint. *See Design Gaps*, 162 F.4th at 483 (holding that the presumption of laches applied where the plaintiff's cease-and-desist letter identified facts that were "virtually identical to those alleged to support [its] Lanham Act claims" in a later lawsuit).

Separately, Pacira conceded in an interrogatory response that it "first learned that Defendants made the claims alleged in [Count I] of the Amended Complaint in or around January 2020." Dkt. No. 170-4 at 18. By its own admission, then — even setting aside the August 2019 FDA letter — Pacira "discovered the facts giving rise to [its] cause of action" nearly a year before November 2020. *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990).

16

Despite triggering the presumption of laches, Pacira fails to explain its delay or show that Defendants have not been prejudiced as a result. It instead argues, in conclusory terms, that Defendants have failed to carry their burden of proving (1) "when Pacira became aware of a viable Lanham Act claim," (2) "that Pacira unduly delayed bringing its claims," or (3) "that any such delay unfairly prejudiced them." Dkt. No. 181 at 40. But, as just explained, the August 2019 FDA letter and Pacira's interrogatory response both show it knew of its claim before November 2020.

Beyond that, Pacira overlooks the analytical framework for evaluating laches. "When a false advertising plaintiff files suit outside of the [analogous limitations period], both elements of laches — unreasonable delay and prejudice — are *strongly presumed*." *PBM Prods.*, 639 F.3d at 121 (emphasis added). A presumption, by definition, "call[s] for a certain result in a given case unless the adversely affected party overcomes it with other evidence." *See, e.g.*, *Presumption*, Black's Law Dictionary (12th ed. 2024) ("A presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption."); 4 John Henry Wigmore, *Evidence in Trials at Common Law* § 2491 (1905) ("[T]he peculiar effect of a presumption . . . is . . . to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent." (emphasis in original)); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("[I]f [one party] is silent in the face of the presumption, the court must enter judgment for [the other party] because no issue of fact remains in the case."); *Lincoln v. French*, 105 U.S. 614, 617 (1881) ("Like other presumptions, it was sufficient to control the decision of the court if no rebutting testimony was produced."). It necessarily follows that a party asserting laches can satisfy its ultimate burden of proving unreasonable delay and prejudice when the opposing side, faced with a triggered presumption, remains silent or offers no rebuttal evidence.

17

Although the presumption alone may suffice under the circumstances, Defendants have also introduced "additional evidence" of prejudice. *See Giddens*, 355 F.2d at 128 (stating that a defendant "may either rest on the inference alone or introduce additional evidence").[7] Defendants note that several key witnesses no longer work for Pacira, including Dave Stack (Chief Executive Officer), John Spranger (Vice President of Sales), Matthew Carangelo (Executive Director of Global Medical Information and Communications), Dennis McLoughlin (Chief Customer Officer), and Dr. Roy Winston (Chief Medical Officer). Dkt. No. 206 at 6. Stack, Spranger, and Carangelo often could not recall basic facts related to the litigation during their depositions, and Spranger and Carangelo, both of whom reside beyond the subpoena power of the court, indicated they do not intend to appear at trial. *Id.*; Dkt. No. 206-4. In addition, Nephron points out that of the 28 Nephron employees identified in Pacira's Rule 26(a) initial disclosures, 17 are now former employees, including 11 who "would have still been current employees had Pacira filed within three years of January 2020." Dkt. No. 206 at 6. The unavailability of witnesses, faded memories, and changes in personnel are all indicators of evidentiary prejudice. *See E.E.O.C. v. Propak Logistics, Inc.*, 884 F. Supp. 2d 433, 443 (W.D.N.C. 2012); *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012); *see also Propak*, 884 F. Supp. 2d at 443 (observing that "the law does not require [a party] to prove the absolute unavailability of . . . witnesses as a prerequisite for laches" (internal quotation marks omitted)).

In sum, considering this evidence together with Pacira's four-year delay in bringing suit and its failure to rebut the resulting presumption of prejudice, the court concludes Count I is barred

---

[7] The defendant in *Giddens* was unable to rely on the presumption alone because the plaintiff "pleaded and proved certain facts indicating the absence of prejudice." 355 F.2d at 128.

by laches.  Because Count I is the only claim asserted against Dr. Worthington, he is dismissed from the case with prejudice.

Nephron's laches defense fares differently, however, as to Count II, which concerns its marketing of RKK.  In the same interrogatory response discussed above in connection with Count I, Pacira stated it first learned of the statements underlying Count II "in or around May 2022." Dkt. No. 170-4 at 18.  Nephron offers no evidence to call that date into question.  Accepting Pacira's representation as true, Count II was filed within the analogous limitations period. Moreover, Nephron identifies no "facts otherwise indicating a lack of vigilance" on the part of Pacira.  *See White*, 909 F.2d at 102 ("The defendant may show lack of diligence either by proof that the action was not commenced within the period provided by the applicable statute of limitations or by facts otherwise indicating a lack of vigilance.").  As a result, Nephron's laches defense as to Count II fails at the first prong.  Count II thus remains in the case, and the court proceeds to address the parties' remaining arguments as they relate to RKK.

### 2.    The RKK Compliance Statements are not statements of opinion

Nephron next contends the RKK Compliance Statements are not actionable because they merely reflect the company's opinion about whether its compounding activities complied with the requirements of Section 503B.  Dkt. No. 170-1 at 24.  The court is not persuaded.

It is true that "statements by laypersons that purport to interpret the meaning of a statute or regulation" generally are nonactionable opinion unless there is "a clear and unambiguous ruling from a court or agency of competent jurisdiction." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).  But sometimes a law is "so clear on its face that no good faith doubt concerning its interpretation [is] possible, even without an explicit statement from [a court or agency]." *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 489 n.3 (D.C. Cir. 1996).  In

19

that circumstance, the law's meaning is "so clear as to be a fact for Lanham Act purposes," *id.*, such that a representation about whether a defendant complied with it could be actionable as a "false or misleading representation of fact." 15 U.S.C. § 1125(a)(1); *see Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 496–97 (1st Cir. 2022); *Pacira BioSciences, Inc. v. Ventis Pharma, Inc.*, No. 2:24-cv-07554-MRA-RAO, 2025 WL 576549, at *8 (C.D. Cal. Jan. 17, 2025). That is the case here.

Section 503B is "clear on its face." *Dial A Car*, 82 F.3d at 489 n.3. It prohibits an outsourcing facility from "compound[ing] using bulk drug substances . . . unless" one of two conditions is met: (1) "the bulk drug substance appears on [the clinical need] list," or (2) "the drug compounded from such bulk drug substance appears on the drug shortage list . . . at the time of compounding, distribution, and dispensing." 21 U.S.C. § 353b(a)(2)(A)(i)–(ii). An outsourcing facility that satisfies neither condition cannot qualify for the Section 503B exemptions. *See Azurity*, 45 F.4th at 496–97 ("[T]here is no interpretation necessary to determine whether section 503B, through the 'bulk drug substance' provision, sets as a condition for the sale of a compounded drug that is made using a bulk drug substance that the bulk substance be on either of the lists that the statutory provision specifies. Section 503B plainly does.").

Accordingly, determining the truth or falsity of an outsourcing facility's claims of compliance with Section 503B's "bulk drug substance" provision requires no more than consulting two lists. *See id.* at 501 ("[T]he adjudication of this claim simply requires a court to ascertain whether a particular drug appears on either the list of 'bulk drug substances for which there is a clinical need,' or on the drug shortage list."). If the bulk drug substances used by the facility appear on the clinical need list, or if the compounded drugs it markets and sells appear on the drug

20

shortage list, then its claims of compliance would be true. But if the facility fails to satisfy either statutory condition, then its claims would be literally false.

Nephron responds that Section 503B is not "clear enough on its face to make up for the absence of" a definitive prior ruling from a court or the FDA because "nothing in the text of [the statute] can be reasonably interpreted to prohibit [its] compounding activities." Dkt. No. 170-1 at 26 (internal quotation marks omitted). In Nephron's view, Section 503B permits an outsourcing facility to market and sell a drug (say, RKK) without FDA approval as long as the individual components of that drug (in the case of RKK, ropivacaine, ketorolac, and ketamine) appear on the drug shortage list. *Id.* at 33, 36 & n.19; Dkt. No. 183 at 10, 17, 19–21. This argument is unavailing.[8]

The drug shortage exception allows outsourcing facilities to "compound using bulk drug substances" only if "the drug compounded from such bulk drug substance appears on the drug shortage list." 21 U.S.C. § 353b(a)(2)(A)(ii). Nephron insists this requirement is satisfied once each bulk drug substance has been compounded into a drug that appears on the drug shortage list — even if those drugs are subsequently combined into a single finished product that is not on the list itself. Dkt. No. 183 at 20–21. Not so. Section 503B defines "compounding" as "the *combining*, admixing, mixing, diluting, pooling, reconstituting, or otherwise altering of a drug or

---

[8] Nephron relies heavily on the expert report of Nathan Brown, a former FDA attorney who was involved in the drafting of the DQSA, to support its interpretation of Section 503B. The court does not consider Brown's views on this issue, as it falls to the court, and the court alone, to determine the meaning of a statute. *See United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("[T]he meaning of [a] statute [is] a subject for the court, not for testimonial experts. The only legal expert in a federal courtroom is the judge." (citation modified)); *cf. Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

bulk drug substance *to create a drug*." 21 U.S.C. § 353b(d)(1) (emphasis added). Under Nephron's own theory, when drugs compounded from bulk drug substances (e.g., ropivacaine, ketorolac, and ketamine) are themselves "combin[ed] . . . to create a drug" (e.g., RKK), an act of "compounding" has occurred. And because the newly created drug traces back to the same bulk drug substances as the drugs combined to create it, the new drug has likewise been "compounded from . . . bulk drug substance[s]." *Id.* § 353b(a)(2)(A)(ii). As a result, it too must be on the drug shortage list if the outsourcing facility wishes to take advantage of the drug shortage exception.

Apart from lacking textual support, Nephron's contrary interpretation also conflicts with the structure and purpose of the FDCA. Congress conditioned the availability of the drug shortage exception on the FDA determining that a particular drug is in short supply. *See* 21 U.S.C. § 356e(a) (instructing the FDA Secretary to "maintain an up-to-date list of drugs that are determined by the Secretary to be in shortage in the United States"); *id.* § 356c(h)(2) (defining "shortage" as "a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug"). Yet on Nephron's telling, outsourcing facilities are free to mix and match individual drugs that appear on the shortage list to create entirely new compounded products, regardless of whether the FDA has determined there to be a shortage of the finished product itself. That result would not only circumvent Congress's decision to tie the exception to a specific drug shortage determination, but would expand the exception beyond its intended purpose of ensuring patient access to drugs that are actually in short supply.

At bottom, Section 503B is "clear enough on its face as to what condition it establishes for the scope of the condition to be a fact." *Azurity*, 45 F.4th at 497. An outsourcing facility cannot compound using a bulk drug substance unless (1) the bulk drug substance appears on the FDA's clinical need list, or (2) "the drug compounded from such bulk drug substance" appears on the

FDA's drug shortage list.  21 U.S.C. § 353b(a)(2)(A)(i)–(ii).  And in the case of the drug shortage exception, "the drug compounded from such bulk drug substance" unambiguously includes the final product of a compounding process that originated with a bulk drug substance.  Thus, given the clarity of Section 503B, any statements by Nephron that communicate its compliance with the statute cannot be construed as mere statements of opinion.  *Cf. Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 592 (D.D.C. 1995) (dismissing Lanham Act claim where "defendants were expressing an opinion on an *inconclusive* question of law" (emphasis added)), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996).

### 3.     The FDCA does not preclude Pacira's challenge to the RKK Compliance Statements

In moving for summary judgment, Nephron renews its argument that Pacira's Lanham Act claim targeting the RKK Compliance Statements is precluded by the FDCA's exclusive enforcement provision.  *See* 21 U.S.C. § 337(a) (providing that all "proceedings" to "enforce[]" or "restrain violations" of the FDCA "shall be by and in the name of the United States," except for certain proceedings brought by state governments).  The court has rejected this argument twice before, Dkt. Nos. 55 at 24–26; 88 at 9–13, and does so again.

In *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014), a unanimous Supreme Court concluded that "[n]othing in the text, history, or structure" of the Lanham Act or FDCA shows that Congress intended to forbid Lanham Act claims challenging "food and beverage labels that are regulated by the FDCA."  *Id.* at 106.  Although *POM Wonderful* specifically concerned the FDA's regulation of "food and beverage labeling," *id.* at 114–16, the "logical building blocks" of its holding apply with equal force to "drug marketing, medical device labeling, cosmetics branding, or any other kind of marking or representation which would fall under both the Lanham

23

Act and the FDCA," *JHP Pharms., LLC v. Hospira, Inc.*, 52 F. Supp. 3d 992, 1000 (C.D. Cal. 2014).  Consistent with this view, "courts adjudicating Lanham Act disputes outside of the food and beverage realm" have "almost uniformly" interpreted *POM Wonderful* "to cover products in other FDA-regulated industries," including pharmaceuticals.  Rachel Simon, *After the Juice Wars: The Post-*POM Wonderful *Legal Landscape and its Implications for FDA-Regulated Industries*, 75 Food & Drug L.J. 430, 443 (2020); *see also Ventis Pharma*, 2025 WL 576549, at *5 ("Following *POM Wonderful*, courts have adopted a general presumption that Lanham Act claims pertaining to FDCA-regulated products are permissible and, often, desirable.").

This is not to say, however, that all drug-related false-advertising claims are permissible post-*POM Wonderful*.  Such a claim may be precluded if, for example, it would "require the expertise of the FDA to resolve," *JHP Pharms.*, 52 F. Supp. 3d at 999, would call on the court "to make an original determination on an issue committed to the FDA's discretion," *Belcher Pharms., LLC v. Hospira, Inc.*, 1 F.4th 1374, 1380 (11th Cir. 2021), or would "otherwise conflict with an affirmative policy judgment by the FDA," *JHP Pharms.*, 52 F. Supp. 3d at 999 (citing *POM Wonderful*, 573 U.S. at 120).  But none of those concerns are present here.

To begin, resolving Pacira's challenge to Nephron's marketing of RKK does not implicate any question beyond the court's ken or encroach on any determination reserved for the FDA. To the contrary, the court need only ascertain whether the bulk drug substances ropivacaine, ketorolac, and ketamine were on the clinical need list when Nephron sold RKK or whether RKK itself was on the drug shortage list.  While deciding whether a particular substance *should* be on the clinical need or drug shortage list undoubtedly falls within the FDA's sole purview, simply checking whether the substance is on the list does not.  *See Pacira Biosciences, Inc. v. QuVa Pharma, Inc.*, No. 4:23-cv-4147, 2024 WL 4329142, at *5 (S.D. Tex. Aug. 26, 2024) ("[A] claim that merely

24

requires a court to cross-reference a list is not precluded."), *report and recommendation adopted*, 2024 WL 4357567 (S.D. Tex. Sept. 30, 2024); *cf. Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 939 (8th Cir. 2005) ("The question of whether [the defendant's product] has been approved as safe and effective is much different from the question of whether [the product] should be approved as safe and effective, and it is only the latter that requires the FDA's scientific expertise.").

Nor would adjudicating Pacira's claim conflict with any FDA policy judgment. Nephron hangs its hat on the Interim Bulk Drug Policy, in which the FDA announced it did "not intend to take action against an outsourcing facility for failing to compound in accordance with [the bulk drug substance provision] if certain conditions [were] met." 2016 WL 3357247 at *5. But Nephron's reliance on this document is misplaced. The Interim Bulk Drug Policy merely addressed how the FDA planned to exercise its enforcement discretion. That the FDA declined to take action against outsourcing facilities that compounded bulk drug substances on the Category 1 list does not mean those facilities could hold themselves out as compliant with Section 503B.[9] *See Allergan USA Inc. v. Imprimis Pharms., Inc.*, No. SA CV 17-1551-DOC (JDEx), 2017 WL

---

[9] To the extent Nephron contends the Interim Bulk Drug Policy established a third pathway to Section 503B compliance by compounding bulk drug substances on the Category 1 list, that contention is incorrect. The Interim Bulk Drug Policy acknowledged — consistent with the plain language of the statute — that "an outsourcing facility may *only* compound using bulk drug substances that are on [the clinical need list] or that are used to compound drugs that appear on the shortage list in effect . . . at the time of compounding, distribution, and dispensing." 2016 WL 3357247 at *5 (emphasis added). In any event, even if the Interim Bulk Drug Policy purported to create a third pathway, it is well settled that an agency's "'interpretation' of [a] statute cannot supersede the language chosen by Congress." *Mohasco Corp. v. Silver,* 447 U.S. 807, 825 (1980); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 576 (2015) (Alito, J., dissenting) ("It is a bedrock rule that an agency can never 'rewrite clear statutory terms to suit its own sense of how the statute should operate.'" (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014))).

10526121, at *8 (C.D. Cal. Nov. 14, 2017) ("[T]he FDA's decision to decline enforcement of certain Section 503A and 503B requirements does not help Imprimis. As an executive agency, the FDA has discretion to enforce the law, but the lack of enforcement does not make Imprimis's actions legal.").

Moreover, this case does not ask the court to second-guess the FDA's decision to forgo enforcement against Nephron. Pacira, after all, "seeks to enforce the Lanham Act, not the FDCA or its regulations," *POM Wonderful*, 573 U.S. at 117, and nothing in Section 503B or the Interim Bulk Drug Policy addresses what statements outsourcing facilities may make in advertising. Thus, the court can resolve Pacira's claims without calling into question anything the FDA has said or done with respect to Nephron. *Cf. Exela Pharma Scis., LLC v. Sandoz, Inc.*, 486 F. Supp. 3d 1001, 1024–25 (W.D.N.C. 2020) (finding Lanham Act claim precluded because it challenged the content of Dear Healthcare Provider letters that the FDA had mandated and preapproved).

The cases Nephron cites in support of its preclusion argument are inapposite. *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990), and *Amarin Pharma, Inc. v. International Trade Commission*, 923 F.3d 959 (Fed. Cir. 2019), both turned on an interpretive question whose resolution implicated the FDA's expertise — in *Sandoz*, whether demulcents in the defendant's cough syrup should be labeled as "active" or "inactive" ingredients, and in *Amarin*, whether synthetically produced omega-3 products qualify as "dietary supplements" or instead "new drugs" that require FDA approval. No such question is presented here. Section 503B plainly sets out two — and only two — ways an outsourcing facility may compound using a bulk drug substance. And the FDA has already applied its expertise by compiling the clinical need and drug shortage lists. All that is left for the court to do is to consult those "readily identifiable lists." *Azurity*, 45 F.4th at 497.

26

*Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993), is also inapt. The plaintiff there claimed the defendants had violated the Lanham Act by falsely representing their drugs had been "properly approved by the FDA." *Id.* at 1139. The Fourth Circuit affirmed dismissal of this claim because the plaintiff could not point to "*any* statement or representation in the defendants' advertising which declared 'proper FDA approval.'" *Id.* (emphasis added). The court added that allowing the plaintiff to proceed on the theory that "the very *act* of placing a drug on the market" somehow implied that the drug had received FDA approval "would, in effect, permit [the plaintiff] to use the Lanham Act as a vehicle by which to enforce the [FDCA]." *Id.* (emphasis in original). Here, though, Pacira is not relying on RKK's mere presence in the market to support its false-advertising claim. Rather, it claims Nephron made affirmative representations about RKK's compliance with Section 503B — for example, by identifying RKK as a "503B Product" in its product lists and pricing sheets and describing itself as "a leading manufacturer" of "503B outsourcing products" in a product slick for RKK. Dkt. Nos. 169-22 at 21, 24; 169-23 at 5. *Mylan* therefore is of no help to Nephron.

For all these reasons, the FDCA does not preclude Pacira's Lanham Act claim predicated on the RKK Compliance Statements.

### 4.     The court will limit its analysis to the statements identified in Count II of the Complaint

In a final threshold argument, Nephron urges the court not to consider certain establishment claim statements identified by Pacira for the first time at summary judgment. Nephron submits the statements "being litigated cannot be a constantly moving target for Defendants as Pacira's theories evolve" and that "Pacira should be held to the allegations it brought in [the Complaint]." Dkt. No. 183 at 13–14. On this point, the court agrees.

27

In paragraphs 66–82 of its summary judgment brief, Pacira identifies several statements made by Dr. Worthington and Nephron sales representatives in emails broadly claiming that (1) Nephron had "white papers" and "studies" to support the safety and efficacy of BKK and RKK and (2) the drugs have been "shown" or "proven" to lead to particular clinical outcomes ("Sales Rep Statements"). Dkt. No. 169-1 at 18–21. These statements include:

- "BKK cases have shown that it does in fact improve patient outcomes." Dkt. No. 169-12 at 4.

- "We have multiple hospital system references that have already successfully implemented [the switch from EXPAREL to BKK, RKK, and RCK] and we can connect you with them, if you would like. In addition we are happy to provide you with supporting literature and even coordinate clinician to clinician education." Dkt. No. 169-24 at 3.[10]

- "I just wanted to send you some information on BKK so you can present to P&T as well. I have attached four studies that show the benefits of using opioid free analgesia[.]" Dkt. No. 169-27 at 2.

- "Nephron produces BKK, RKK, & RCK as generic, clinical need medications as requested by physicians across the country. We have white-paper studies and clinical references that we can connect you with." Dkt. No. 169-35 at 2.

- "█████████████████████████████ switched from ultrasound guided adductor canal blocks PLUS Ropivacaine/ketorolac, clonidine over to BKK periarticular only, and after a short 100 patient pilot found BKK equally efficacious and much, much simpler and less expensive. (This data will be published soon.)" Dkt. No. 169-38 at 2.

- "I do have articles that go over BKK and RKK [i]ndividually. Please let me know if you would like any of that data." Dkt. No. 169-39 at 2.

- "I wanted to send you those studies that we discussed about BKK that shows that using and [sic] opioid free analgesia is best for patients." Dkt. No. 169-40 at 2.

---

[10] RCK is a compounded drug consisting of ropivacaine, clonidine, and ketorolac.

- "I have attached some BKK information and clinical white papers on the benefits of multimodal analgesia." Dkt. No. 169-41 at 2.

- "We have seen the prolonged analgesia affects [sic] last between 2-4 days postoperatively. I have attached a few articles to this email that discuss the benefits of this multimodal approach. One of the documents titled 'BKK: WHY WHEN HOW,' was written by Dr. Bradley Worthington, an anesthesiologist in Nashville, TN who has used BKK in over 120,000 cases." Dkt. No. 169-42 at 2.

- "We are not making claims, but we have white-paper studies and physician references across the country that we can connect you with." Dkt. No. 169-43 at 2.

- "I do have 20 years of clinical data I can share. Attached are a group of decks and white papers that give a good 30,000-foot view of [BKK]." Dkt. No. 169-44 at 2.

- "Here is all of the information on our BKK product, to use as a less expensive alternative to Exparel." Dkt. No. 169-47 at 2.

- "[BKK] is a [sic] opioid free multimodal analgesic that is proven to decrease the cost of care while also allowing patients to recover from painful surgeries quickly and in an efficient manner." Dkt. No. 169-48 at 7.

- "Please have a look at the attached document regarding our opioid free products. These are often times compared to exparel… At only a fraction of the cost and proven to enhance patient recovery[.]" Dkt. No. 169-49 at 2.

- "[BKK] has shown to help improve satisfaction and outcomes, decrease length of stays, reduce costs and reduce readmissions." Dkt. No. 169-50 at 3.

- "We have seen feedback of 24-48 hours of post-operative analgesia with our multimodal syringes. I have attached a few different articles here that explain the benefits of a multimodal approach, versus Exparel which is only a unimodal product." Dkt. No. 169-51 at 2.

Pacira contends these statements are all literally false because Nephron had not conducted *any* studies on BKK or RKK and the materials it sent to customers involved entirely different drugs or only components of BKK and RKK.[11]  Dkt. No. 169-1 at 33–36.

The problem for Pacira is that none of the Sales Rep Statements appear among the statements enumerated in the Complaint.  It is axiomatic that a plaintiff cannot "plead one theory and one set of facts in his complaint, and then proceed to trial on an entirely different theory supported by entirely different facts."  *Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 154 (4th Cir. 2020).  "That kind of wholesale change is tantamount to a constructive amendment of a complaint, and '[a] district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims.'"  *Id.* (quoting *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017)).

Although Pacira argues otherwise, the court concludes the Sales Rep Statements amount to "new factual claims."  The Fourth Circuit has made clear that a false-advertising claim cannot be pieced together from multiple different statements.  *See Verisign*, 848 F.3d at 299 ("[A] Lanham Act claimant may not mix and match statements, with some satisfying one Lanham Act element and some satisfying others.").  Rather, each statement must be assessed "independently."  *Johnson & Johnson*, 299 F.3d at 1248; *Genus Lifesciences Inc. v. Lannett Co.*, No. 18-cv-07603-WHO, 2019 WL 4168958, at *4 (N.D. Cal. Sept. 3, 2019) ("Lanham Act claims must be evaluated on a statement-by-statement basis.").  Given this requirement, the Sales Rep Statements cannot be used

---

[11] *See, e.g.*, Dkt. Nos. 169-36 at 4 (article analyzing the use of ropivacaine, epinephrine, clonidine, and ketorolac in total knee arthroplasty); 169-40 at 13 (study on the use of ketamine and bupivacaine in total knee arthroplasty); 169-40 at 29 (article discussing the efficacy of liposomal bupivacaine in total knee arthroplasty); 169-44 at 37 (study on the effect of adding ketamine to ropivacaine in nerve blocks).

to prove a Lanham Act violation as to any of the statements actually alleged in the Complaint. Each Sales Rep Statement instead must stand on its own, supported by its own showing of falsity, materiality, deception, use in interstate commerce, and injury.  But an independent basis for liability, premised on a statement never alleged in the Complaint, is necessarily a "new factual claim[]." *Faulconer*, 808 F. App'x at 154 (quoting *Chessie Logistics*, 867 F.3d at 860); *see also Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808–09 (7th Cir. 2014) (distinguishing between an impermissible "new factual theory of liability" and a permissible "alternative legal characterization" of the complaint's facts).

Considering that the Sales Rep Statements were not pleaded in the Complaint, Dkt. No. 25 ¶¶ 162, 168, addressed by the parties at the motion-to-dismiss stage, Dkt Nos. 41-1 at 11–15; 50 at 9–12, or identified by Pacira in its interrogatory responses, Dkt. No. 170-4 at 12–15, the court, in its discretion, will not allow Pacira to inject them into the case now at summary judgment. Instead, the court will limit its consideration of Nephron's alleged Lanham Act violations to the statements and categories of statements identified in paragraph 168 of the Complaint.  That is, the court will consider only the statements Pacira has identified as conveying that RKK was compounded "in compliance with Section 503B" or "in a 503B-compliant outsourcing facility," along with the specific statements that RKK is "generic to or substitutable for EXPAREL," provides "improved value" over EXPAREL, "reduces post-operative pain[,] complications, risk of readmission, length of stay, [and] patient morbidity and mortality," "eliminates opioid related

31

adverse drug effects," and has "low reported incidents of nausea and vomiting."[12]  Dkt. No. 25 ¶ 168.

### C.    Merits of Count II

Having resolved these preliminary issues, the court turns to whether Pacira can show that any of Nephron's challenged statements violated the Lanham Act.  The court analyzes the statements element by element, beginning with falsity.

### 1.    Falsity

As mentioned, to demonstrate falsity, a plaintiff must show (a) that the statement was "literally false," either "on its face" or "by necessary implication," *Verisign*, 848 F.3d at 302; *Scotts Co.*, 315 F.3d at 274 (internal quotation marks omitted), or (b) that the statement, although "literally true" or ambiguous, was nevertheless "likely to mislead and to confuse consumers," *Scotts Co.*, 315 F.3d at 273 (internal quotation marks omitted).  In analyzing whether a statement is literally false, the court must determine whether the statement, in its "full context," conveys an unambiguous message and, if so, whether the message conveyed is false.  *Scotts Co.*, 315 F.3d at 274, 275 (internal quotation marks omitted).  To prevail when the challenged statement is not literally false, the plaintiff must present "extrinsic evidence of consumer confusion."  *Id.* at 274, 276; *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir. 1992) ("[A] court may

---

[12] Even if the court were to consider the Sales Rep Statements, Pacira's claims based on those statements would still fail.  The vast majority of the Sales Rep Statements involve BKK, which is no longer at issue following the dismissal of Count I.  And as for the few Sales Rep Statements that do mention RKK, Pacira identifies no evidence showing that *those specific statements* caused it economic injury.  *See Lexmark*, 572 U.S. at 140 (explaining that a false-advertising plaintiff "cannot obtain relief without evidence of injury proximately caused by [the defendant's] alleged misrepresentations" (emphasis omitted)).

find on its own that a statement is literally false, but, absent a literal falsehood, may find that a statement is impliedly misleading only if presented with evidence of actual consumer deception.").

### a.     RKK Compliance Statements

### i.     Listing RKK as a "503B Product"

The first representation Pacira identifies as conveying that RKK was compounded "in compliance with Section 503B" appeared in Nephron's product lists and pricing sheets. Those materials, which were distributed to members of group purchasing organizations ("GPOs"), healthcare systems, and individual hospitals, listed RKK among Nephron's "503B Products." Dkt No. 169-22 at 21, 24; 160-2 at 16–35. Pacira argues — and the court agrees — that this designation was false because it necessarily implied RKK satisfied the requirements of Section 503B when in fact it did not.

"A literally false message may be . . . conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Scotts Co.*, 315 F.3d at 274 (internal quotation marks omitted). Here, the heading "503B Products" unambiguously refers to Section 503B of the FDCA. By listing RKK under that heading, Nephron necessarily communicated to purchasers that RKK belonged to the class of products meeting the statute's requirements; no other conclusion can be drawn from its designation as a "503B Product." *See Design Res.*, 789 F.3d at 502–03 (recognizing that "[a] false advertising claim can . . . depend on the consumer to draw conclusions that are logically necessary from an ad's statements").

The next step is to determine whether the unambiguous message conveyed by that designation was false. As discussed extensively above, Section 503B prohibits outsourcing facilities from "compound[ing] using bulk drug substances" unless "the bulk drug substance

33

appears on [the clinical need] list" or "the drug compounded from such bulk drug substance appears on the drug shortage list." 21 U.S.C. § 353b(a)(2)(A)(i)–(ii). If neither condition is satisfied, an outsourcing facility that compounds with bulk drug substances cannot claim Section 503B compliance.

It is undisputed Nephron used bulk drug substances to compound RKK. Dkt. No. 60 ¶ 120. It is also undisputed that, during the period Nephron marketed and sold RKK, the bulk drug substances ropivacaine, ketorolac, and ketamine never appeared on the clinical need list and RKK itself never appeared on the drug shortage list. Dkt. Nos. 60 ¶¶ 128, 130; 169-16; 169-17. As a result, Nephron's compounding of RKK did not comply with Section 503B. And because Nephron's listing of RKK as a "503B Product" necessarily implied that it did comply with the statute, the court concludes as a matter of law that the listing was literally false.[13]

### ii.    Nephron is "a leading manufacturer of 503B outsourcing products"

The second RKK Compliance Statement identified by Pacira is the statement: "Nephron Pharmaceutical Corporation is a leading manufacturer of generic respiratory and 503B outsourcing products." This statement appeared at the bottom of a Nephron product slick featuring BKK, RCK, and RKK:

---

[13] The court rejects Nephron's contention that the pricing sheets were not sufficiently disseminated to the relevant purchasing public. To constitute "commercial advertising or promotion" under the Lanham Act, the challenged statement must be "part of an organized campaign to penetrate the relevant market," which typically involves "widespread dissemination within the relevant industry." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Pacira readily satisfies this requirement. The "503B Products" pricing sheets were disseminated through GPOs to hundreds of healthcare systems and individual hospitals across the country. Dkt. No. 160-2 at 16–35; *see Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 262 (4th Cir. 2017) (holding that a single email to 36 grocery retailers "was sufficiently disseminated to be an attempt to penetrate the relevant market").

34



Dkt. No. 169-23 at 5. Again, Pacira contends this statement was literally false because it necessarily implied that the products featured in the slick, including RKK, were compounded in compliance with Section 503B.

The court disagrees. The message conveyed by the "leading manufacturer" statement is inherently ambiguous. The statement could be understood as representing that the products featured on the slick are themselves "503B outsourcing products." But it also could be understood as conveying that Nephron manufactures "503B outsourcing products" as part of its broader

business, without necessarily implying that BKK, RCK, and RKK fall within that category. Given this ambiguity, the statement cannot be literally false. *See Scotts Co.*, 315 F.3d at 275–76.

When a statement is literally true or too ambiguous to support a finding of literal falsity, "it is incumbent on the plaintiff to present 'extrinsic evidence of consumer confusion,' generally in the form of consumer survey evidence." *Verisign*, 848 F.3d at 304 (quoting *Scotts Co.*, 315 F.3d at 274, 276). Pacira did conduct a consumer survey of 406 healthcare professionals during discovery (the "Butler Survey").[14] But while Pacira tested consumer perception of Nephron's "503B outsourcing facility" logo, it did not assess the "leading manufacturer" statement. In *Verisign*, the Fourth Circuit held that survey evidence bearing on one set of statements could not be used to show consumer confusion as to a separate, untested statement. 848 F.3d at 304. The same reasoning applies here. Without any extrinsic evidence showing how consumers perceived the "leading manufacturer" statement in particular, Pacira cannot proceed on an implied falsity theory. Nephron is thus entitled to summary judgment on this statement.

### iii.     Nephron's "503B outsourcing facility" logo

The final RKK Compliance Statement at issue is Nephron's "503B outsourcing facility" logo. This logo appeared throughout Nephron's materials, including the "Opioid Free" product slick (shown above) and the product label for RKK. As with the prior two statements, Pacira argues the logo conveyed by necessary implication that RKK complied with Section 503B.

But like the "leading manufacturer" statement, the message communicated by Nephron's "503B outsourcing facility" logo is too ambiguous to be literally false. On the one hand, the logo

---

[14] Nephron has moved to exclude the Butler Survey and Dr. Butler's accompanying expert report on *Daubert* grounds. Dkt. No. 163. The court addresses the merits of that motion in the next section.

could be interpreted as communicating that the products it accompanied were compounded in compliance with Section 503B.  On the other hand, it could be interpreted as simply representing that Nephron was registered with the FDA as an outsourcing facility — a representation that is literally true.  Because the logo is "susceptible to two reasonable readings, one of which is literally true," it cannot be false by necessary implication.  *Millennium Labs. v. Ameritox, Ltd.*, 924 F. Supp. 2d 594, 600 (D. Md. 2013).

All is not lost for Pacira, though.  It can still prove falsity by presenting evidence showing that the "503B outsourcing facility" logo "tend[ed] to deceive or mislead a substantial portion of the intended audience."  *PBM Prods.*, 639 F.3d at 123 (internal quotation marks omitted).  To that end, Pacira tested consumer perception of the logo through the Butler Survey, which presented respondents with a sample marketing email about BKK.  The logo appeared both on an image of BKK's product label included in the email and in the email's signature block.  Dkt. No. 163-4 at 22, 84–87.  Based on responses to the survey, Butler concluded that a net 14.8% of respondents believed BKK was a Section 503B-compliant drug.  *Id.* at 6.  That percentage would ordinarily be sufficient to support a finding that an advertisement misled or tended to mislead consumers.  *See RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 373 (4th Cir. 2021) ("We previously have explained that survey evidence demonstrating confusion in 10% or more of consumers supports a finding that actual confusion exists."); *see also* 5 McCarthy, *supra*, § 32:193 ("Since the issue of likely customer deception from an allegedly false advertisement is closely analogous to the issue of likely confusion from an allegedly infringing mark, it is proper to use the percentage figures accepted in likelihood of confusion surveys.").

For its part, Nephron moves to exclude the results of the Butler Survey under Federal Rules of Evidence 403, 702, 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

37

(1993). Dkt. No. 163. Nephron initially argues that because the email shown to participants focused only on BKK, the deception rate calculated by Butler cannot be "extrapolated" to RKK. Dkt. Nos. 163-1 at 12–13; 198 at 5–8. Although this argument has some intuitive appeal, the court believes it goes to the weight of the evidence, not its admissibility. This is not a scenario where Pacira seeks to extend survey results to an entirely separate and untested statement (as with the "leading manufacturer" statement). Rather, the same "503B outsourcing facility" logo appeared on the product labels for both BKK and RKK, Dkt. Nos. 169-26 at 4; 169-28 at 3, and it is not immediately clear consumers would perceive the logo differently depending on the product to which it was affixed. Under these circumstances, the weight to be given Butler's findings, as applied to RKK, is for the jury to decide. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

Apart from its extrapolation argument, Nephron also maintains the Butler Survey's methodology was "fatally flawed," rendering its results unreliable and thus inadmissible. Nephron specifically objects that (1) Butler's deception estimate was the product of a biased and leading closed-ended question; (2) the survey lacked a proper control group; and (3) by allowing respondents to review the email while answering questions, Butler turned the survey into an impermissible "reading test." Dkt. No. 163-1 at 17–19, 22–25, 27–28. In the court's view, however, none of these purported flaws are sufficient to warrant exclusion under *Daubert* and the Federal Rules of Evidence. *See PBM Prods.*, 639 F.3d at 123 (explaining that instances where "the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible . . . will be rare" (internal quotation marks omitted)); 5 McCarthy, *supra*, § 32:170

38

("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.").

***Closed-ended question.*** The Butler Survey began with an open-ended question asking, "Other than advertising a particular product, what message or messages does this email communicate to you?" Respondents could type their answer in a text box or select "Don't know / Unsure." Those who typed an answer were asked, "What other message or messages does this email communicate to you?" and again had the option to type a response or select "Don't know / Unsure." All respondents were then asked two "blocks" of questions, Block A and Block B. The order of the two blocks was randomized "to guard against order effects."[15] Dkt. No. 163-4 at 17.

Block A contained two questions designed to test whether respondents believed BKK was a Section 503B-compliant drug. Respondents were first asked, "Which of the following, if any, are message(s) communicated by this email?" ("Question 3"), and were shown the following response options:

> 1. BKK, an admixture of bulk drug substances from Nephron, is a 503B compliant drug
> 2. BKK, an admixture of bulk drug substances from Nephron, is opioid free
> 3. BKK, an admixture of bulk drug substances from Nephron, is packaged in syringe form
> 4. None of these
> 5. Don't know / unsure

Respondents who selected the first option were asked a follow-up open-ended question to assess why they believed BKK was Section 503B compliant. Respondents who did not select the first

---

[15] "Order effect" refers to the "tendency of respondents to choose an item based in part on the order of response alternatives on the questionnaire." Shari Seidman Diamond, *Reference Guide on Survey Research*, *in Reference Manual on Scientific Evidence* 359, 420 (3d ed. 2011).

option proceeded directly to Block B or, if they had already answered Block B, to the end of the survey.

Nephron criticizes Butler's use of Question 3 to formulate her deception estimate. Dkt. 163-1 at 17. It asserts that closed-ended questions should be avoided when testing consumer deception because they are "highly susceptible to demand effects and focalism."[16] *Id.* In its view, the "standard, accepted methodology" for assessing deception is to begin with general open-ended questions about the messages communicated by the advertisement, and then gradually move to more pointed open-ended questions that elicit consumers' perception of the specific issue being tested. *Id.* at 17–18.

Contrary to Nephron's assertion, however, there is nothing inherently wrong in using closed-ended questions to test consumer impressions. *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1113 (C.D. Cal. 2015) ("[C]lose-ended questions are not inherently suspect, and courts frequently rely on the data obtained from such questions."); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 954 (N.D. Ill. 2009) ("Properly-drafted closed-ended, multiple choice questions are not inherently leading simply because they provide respondents with an explicit set of responses from which to choose."). Indeed, closed-ended questions can be "suitable for assessing choices between well-identified options" and "may remind respondents of options that they would not otherwise consider or which simply do not come to

---

[16] "'Demand Effects' in a survey are produced when respondents use cues from the survey procedures and questions to infer the purpose of the survey and identify the 'correct' answers." 5 McCarthy, *supra*, § 32:172. "Focalism bias" occurs when "respondents pay more attention to a product attribute or feature in the choice exercises than they ordinarily would in the actual purchase process." *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1049 (C.D. Cal. 2018) (internal quotation marks omitted).

mind as easily." Diamond, *supra*, at 392, 394; *see also LG Elecs.*, 661 F. Supp. 2d at 955 ("Given that the universe surveyed . . . does not necessarily make appliance purchasing decisions impetuously, the closed-ended question may provide relevant information beyond what first pops into the minds of respondents.").

Moreover, open-ended questions present their own drawbacks. For example, "respondents answering open-ended questions may be less likely to report some information that they would reveal in response to a closed-ended question when that information seems self-evident or irrelevant." Diamond, *supra*, at 392 n.148. Additionally, analyzing and coding open-ended data requires the researcher to make subjective assessments about what the respondent actually meant or intended. Dkt. No. 163-7 at 11 (citing Janice Ballou, *Open-Ended Question*, *in Encyclopedia of Survey Research Methods* 547, 548–49 (Paul J. Lavrakas ed. 2008)). "Because respondents are answering in their own words and may not provide precise answers," Butler explains, "many answers are simply not clear enough to definitively evaluate or categorize reliably." *Id.*

Given the tradeoffs inherent in both question formats, Nephron's criticisms of Butler's use of a closed-ended question to measure deception are fodder for cross-examination, not grounds for exclusion. *See, e.g.*, *Hayward Indus., Inc. v. Blueworks Corp.*, No. 3:20-cv-710-MOC-DSC, 2023 WL 8791687, at *1 (W.D.N.C. Dec. 19, 2023) ("[O]bjections to alleged flaws in surveys should be handled by cross-examination, not exclusion.").

Nephron also faults Butler for not including a "full-filter" question before Question 3 to assess whether respondents had even thought of Section 503B compliance as a message the email communicated. Dkt. No. 163-1 at 18. But Question 3 included a "Don't know / unsure" answer choice, which is a recognized way "to screen out respondents who may not have an opinion on the issue under investigation." Diamond, *supra*, at 421; *see also id.* at 390 ("By signaling to the

respondent that it is appropriate not to have an opinion, [a quasi-filter] question reduces the demand for an answer and as a result, the inclination to hazard a guess just to comply."). Whether Butler should have used a full-filter question instead is simply another matter for cross-examination.

*Control group.* Nephron next argues that exclusion is warranted because Butler made "excessive and biased" changes to the stimulus shown to the control group. Dkt. No. 163-1 at 24.

"A control is designed to estimate the degree of background 'noise' or 'error' in the survey." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010). "Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *Id.* Ideally, the stimulus shown to the control group should "share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." Diamond, *supra*, at 399.

Here, Butler edited the sample email shown to the control group in four respects. She (1) removed both instances of the "503B outsourcing facility" logo; (2) added a disclaimer stating, "Note: the admixture of bulk drug substances sold as BKK is not compounded in compliance with Section 503B"; (3) removed the statement "Nephron continues to strive to provide drugs that are critically short and meet all needs of the Country!"; and (4) modified the statement "This is something that will be huge in helping hospitals decrease opioid and Exparel use" by deleting the reference to EXPAREL. Dkt. No. 163-3 at 52. Nephron takes particular issue with the phrasing of the disclaimer. According to Nephron, the disclaimer is "overly broad and inaccurate" because it "would likely lead participants to conclude that no part of BKK is 503B-compliant." Dkt. No. 163-1 at 25

42

This criticism is unpersuasive. Butler logically explained that she addressed only BKK in the disclaimer because that was the specific product being tested by the survey. Dkt. No. 163-7 at 24–25. The court struggles to see why respondents needed to be informed of the compliance status of bupivacaine, ketorolac, and ketamine individually when they were being asked about the admixture BKK. In any event, whether the disclaimer could have been worded differently, and whether one was necessary at all, are issues Nephron can cross-examine Butler about at trial. The court cannot say, though, that the control stimulus was so poorly designed as to render the results of the Butler Survey unreliable and thus inadmissible. *See, e.g.*, *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 457 (D.S.C. 2019) ("[E]ven if a better control could be chosen, that will go to weight rather than admissibility."); *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, Nos. 18 Civ. 05290 (CM), 19 Civ. 04693 (CM), 20 Civ. 10195 (CM), 2023 WL 6614486, at *17 (S.D.N.Y. Sept. 20, 2023) ("Any issues with the control stimuli . . . go only to weight but do not merit exclusion.").

*"Reading test."* Lastly, Nephron argues the Butler Survey employed an improper "reading test" methodology by leaving the stimulus visible while respondents answered questions. Dkt. No. 163-1 at 27.

One school of thought holds that a "reading test" — i.e., where the stimulus remains with the respondent throughout the survey — is appropriate in situations, as here, "where consumers make involved, deliberate, thoughtful [purchasing] decisions." Jerre B. Swann, *A "Reading" Test or A "Memory" Test: Which Survey Methodology Is Correct?*, 95 Trademark Rep. 876, 880 (2005); *cf. Barre-National, Inc. v. Barr Labs., Inc.*, 773 F. Supp. 735, 745 n.20 (D.N.J. 1991) (according little weight to a survey that required pharmacists to recall product information under conditions that did not resemble their "normal ordering process"). But others take the view that a "memory test" — i.e., where the stimulus is removed from view before the questions are asked —

43

is the superior methodology regardless of the product at issue and level of consideration it requires. Henry D. Ostberg, *Response to the Article Entitled, "A 'Reading' Test or a 'Memory' Test: Which Survey Methodology Is Correct?,"* 95 Trademark Rep. 1446, 1449 (2005).

As with Nephron's first two arguments, this dispute over methodology is not a basis for excluding the Butler Survey wholesale. *See, e.g.*, *Maker's Mark Distillery, PBC v. Spalding Grp., Inc.*, No. 3:19-CV-00014-GNS-LLK, 2024 WL 947475, at *3 (W.D. Ky. Mar. 5, 2024); *In-N-Out Burgers v. Doll n' Burgers LLC*, No. 20-11911, 2022 WL 791924, at *13 (E.D. Mich. Mar. 14, 2022). Nephron, again, may cross-examine Butler and present expert testimony of its own challenging her choice of methodology.

*     *     *

For these reasons, the court will not exclude the Butler Survey and finds that a genuine dispute of material fact remains on whether Nephron's use of the "503B outsourcing facility" logo on the "Opioid Free" product slick and RKK's product label was misleading.

### b.     RKK Comparison Statements

The second set of statements alleged in Count II are the RKK Comparison Statements. Those statements asserted that RKK (1) is "generic to or substitutable for EXPAREL" and (2) provides "improved value" over EXPAREL. Dkt. No. 25 ¶ 168.

With respect to the first statement, Pacira has not identified any advertisement or promotional material using the exact phrase "generic to or substitutable for EXPAREL" to describe RKK. The only statement in the record mentioning RKK alongside the words "generic" or "substitutable" appears in an email from a Nephron sales representative to a prospective customer. Dkt. No. 169-36 at 2 ("Nephron produces BKK, RKK, & RCK as generic, clinical need medications as requested by physicians across the country."). The email, however, does not

44

mention EXPAREL at all. And Pacira does not explain how the sales representative's statement was otherwise false or misleading. The court will not construct or develop arguments for a party that has failed to do so itself. *See United States v. Miller*, 41 F.4th 302, 313 (4th Cir. 2022) ("[I]t is not our job to wade through the record and make arguments for either party." (internal quotation marks omitted)). Accordingly, Nephron is entitled to summary judgment on the "generic to or substitutable for" statement.

The "improved value" statement appeared in the "Opioid Free" product slick. Pacira's claim based on this statement fails for at least two reasons. For one thing, it does not make an express or implicit comparison to EXPAREL (or any other product for that matter). *Cf. Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946–47 (3d Cir. 1993) (holding that the claim Pennzoil "outperforms any leading motor oil against viscosity breakdown" necessarily implied that Pennzoil was superior to Castrol). For another, a claim that a product provides "improved value" is not susceptible to "empirical verification." *Design Res.*, 789 F.3d at 502 (internal quotation marks omitted). "Value" lacks a single, precise meaning, and there is no benchmark against which to measure any "improvement." The "improved value" statement therefore is not actionable under the Lanham Act, and Nephron is entitled to summary judgment on this statement as well. *See Verisign*, 848 F.3d at 302 ("[T]o be 'false' in any way cognizable under the Lanham Act, a statement must also be one of fact — that is, a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" (quoting *Design Res.*, 789 F.3d at 502)).

### c.    RKK Safety and Efficacy Statements

The final three statements identified by Pacira are the RKK Safety and Efficacy Statements. These statements also appeared in the "Opioid Free" product slick and asserted that RKK (1)

"reduces post-operative pain[,] complications, risk of readmission, length of stay, [and] patient morbidity and mortality"; (2) "eliminates opioid related adverse drug effects"; and (3) has "low reported incidents of nausea and vomiting."

Pacira concedes in response to Defendants' motion for summary judgment that the RKK Safety and Efficacy Statements are "non-establishment" or "bald" claims. Dkt. Nos. 181 at 28; 169-1 at 15. Consequently, Pacira "may prove falsity 'only upon adducing evidence that affirmatively show[s] [Nephron's] claim[s] . . . to be false.'" *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 249 (S.D.N.Y. 2005) (quoting *Quaker State*, 977 F.2d at 62–63); *C.B. Fleet*, 131 F.3d at 435 ("[W]here the claim is made baldly, with no assertion of test or study validation, its literal falsity may only be proven by proof that the favorable fact baldly asserted is false.").

In attempting to prove falsity, Pacira relies on the expert report of Jeffrey Low, a licensed pharmacist with over 25 years of experience. Dkt. No. 181 at 28–29. Low generally opines that the claims made by Nephron's marketing materials were not supported by clinical evidence and that the absence of an FDA-approved label for RKK means it lacked the information "necessary" to ensure its safe and effective use. Dkt. No. 165-2 at 10–11, 17, 58. But Low does not offer an opinion on whether Nephron's bald claims about RKK's safety and efficacy were actually false. He never opines that RKK does *not* "reduce[] post-operative pain[,] complications, risk of readmission, length of stay, [or] patient morbidity and mortality"; that it does *not* "eliminate[] opioid related adverse drug effects"; or that it does *not* have "low reported incidents of nausea and vomiting." Pacira cannot satisfy its burden of proving literal falsity merely by showing that the RKK Safety and Efficacy Statements were "unsubstantiated by acceptable tests or other proof." *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 119 (2d. Cir. 1984). As one court has put it, "It is one thing to say 'that [statement] is false,' but another thing altogether to say

46

'you have no proof.'" *Procter & Gamble Co. v. Kimberly-Clark Corp.*, 569 F. Supp. 2d 796, 803 (E.D. Wis. 2008). When bald claims are at issue, "the latter is not enough." *Id.*

In short, because Pacira offers no affirmative evidence tending to show that the RKK Safety and Efficacy Statements were actually false, its claims based on those statements cannot survive summary judgment.

### 2.    Materiality

The second Lanham Act element, materiality, requires the plaintiff to demonstrate that the defendant's false advertising was "likely to influence the purchasing decision[s] [of consumers]." *Scotts Co.*, 315 F.3d at 272 (internal quotation marks omitted).

There is no genuine dispute that one of the two remaining statements — RKK's "503B Product" designation — was material to purchasers. To begin with, GPOs required Nephron to warrant that the compounded drugs it sold complied with Section 503B. For example, in its contract with ██████████████████████, a GPO with 1,600 member hospitals, Nephron represented that its "compounding activities" would comply with "all applicable federal, state, and local laws and regulations, including Section 503B of the Federal Food Drug and Cosmetic Act." Dkt. Nos. 160-2 at 17; 160-8 at 7. Similarly, in its contract with ██████, a GPO with 4,000 members, Nephron "represent[ed] and warrant[ed] that . . . all Services provided under [the] Agreement [would] be for drugs actively listed on the FDA drug shortage website." Dkt. Nos. 160-2 at 18; 160-8 at 8; *see also* Dkt. No. 160-8 at 8 ("Failure of Seller to comply will be considered a material breach of this Agreement."). Parties do not typically bargain for guarantees on matters they consider unimportant. That Nephron's contracts with GPOs included an express warranty of Section 503B compliance is compelling evidence that such compliance mattered to purchasers of RKK.

47

Nephron does not seriously dispute that representations about a drug's compliance with Section 503B are likely to influence consumers' purchasing decisions. To the contrary, Nephron's corporate designee agreed at her deposition that whether Nephron "was complying with Section 503B" was "important to its customers." Dkt. No. 169-7 at 10. And in its briefing, Nephron explicitly conceded that "customers would not purchase BKK or RKK unless they were Section 503B compliant." Dkt. No. 160-1 at 10; *see also id.* ("Of course customers would not purchase BKK or RKK if they were not compliant with Section 503B."); Dkt. No. 163-1 at 24 (arguing that the disclaimer added to the control group stimulus regarding BKK's compliance status "could very well be relevant to physicians considering BKK").

In light of these undisputed facts and Nephron's concessions, the court grants summary judgment to Pacira on whether RKK's "503B Product" designation was material to consumers. The court, however, denies summary judgment on the materiality of the "503B outsourcing facility" logo. A reasonable jury may very well conclude the logo misleadingly suggested RKK was compounded in compliance with Section 503B. In that case, materiality would be established for the same reasons discussed above. But because a genuine dispute remains on the meaning of the logo in the first place, materiality as to this statement cannot be resolved at summary judgment.

### 3.     Deception

The third element of a false-advertising claim asks whether the challenged statement "actually deceives or has the tendency to deceive a substantial segment of its audience." *Scotts Co.*, 315 F.3d at 272 (internal quotation marks omitted). The evidence required at the third element depends on "whether the case involves advertising that is literally false or advertising that is only impliedly false." *Id.* at 274. As noted, if the statement is literally false, "deception of the purchasing audience is presumed," *De Simone*, 395 F. Supp. 3d at 628, and "no evidence of

48

consumer confusion is required," *Scotts Co.*, 315 F.3d at 274. "But if [the] plaintiff's theory of recovery is premised upon a claim of implied falsehood, [it] must demonstrate, by extrinsic evidence, that the challenged [statement] tend[ed] to mislead or confuse consumers." *Scotts Co.*, 315 F.3d at 273 (internal quotation marks omitted).

Here, the court has concluded that RKK's "503B Product" designation was literally false. *See supra* Section III.C.1.a.i. Consumer deception is thus presumed, and Pacira will not be required to present evidence at trial showing that consumers were actually misled by the designation.

As for the "503B outsourcing facility" logo, a genuine dispute of material fact exists on whether the logo misled or tended to mislead purchasers of RKK. *See supra* Section III.C.1.a.iii. Accordingly, neither party is entitled to summary judgment on the deception element as it relates to the logo.

### 4.     Interstate commerce

The parties do not directly address the fourth element, but the undisputed evidence shows that Nephron placed the remaining two challenged statements in interstate commerce. The pricing sheets listing RKK as a "503B Product" were disseminated to GPO members across the country; Nephron sold RKK bearing the "503B outsourcing facility" logo to purchasers outside of South Carolina; and it distributed the "Opioid Free" product slick featuring the logo via email. Dkt. Nos. 160-2 at 16–35, 85; 169-23 at 2–5. Based on these undisputed facts, Pacira is entitled to summary judgment on the interstate-commerce element as to both remaining statements. *See G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 761 F. Supp. 3d 827, 853 (D. Md. 2025) ("It is well established that the use of the internet to communicate a message suffices to satisfy the interstate commerce element of a Lanham Act violation.").

### 5.     Injury

"[T]he indispensable fifth element of a Lanham Act claim is that the plaintiff has been or is likely to be injured as a result of the [alleged] misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its product."[17]  *Verisign*, 848 F.3d at 300 (internal quotation marks omitted).

The record here contains evidence showing that certain customers who had previously purchased EXPAREL (1) began buying RKK when it came on the market, (2) simultaneously reduced their purchases of EXPAREL, and (3) were members of GPOs that had received Nephron pricing sheets listing RKK as a "503B Product."[18]  *See* Dkt. Nos. 160-2 at 108–114; 160-3 at 122, 143, 156–59.  Taken together, and viewed in the light most favorable to Pacira, these facts give rise to a genuine dispute of material fact as to whether Nephron's false advertising diverted sales

---

[17] The court understands the "likely to be injured" language as being limited "to situations in which plaintiffs seek prospective injunctive relief against ongoing or forecasted false advertising."  *GWA III*, 803 F. Supp. 3d at 403.  When, as here, "a plaintiff seeks to invoke the Lanham Act to remedy a past violation, it must show that the violation proximately caused an actual injury."  *Id.*; *see also Lexmark*, 572 U.S. at 140 ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."); *Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Va., Inc.*, 685 F. App'x 277, 279 (4th Cir. 2017) (affirming dismissal of false-advertising claim where the complaint "d[id] not identify a single consumer who withheld or cancelled business with [the plaintiff] or point[] to a particular quantum of diverted sales or loss of goodwill and reputation resulting directly from reliance on any false or misleading representations by Defendants"); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003) (affirming summary judgment on false-advertising claim where there was "no evidence of actual damages or a causal link between actual damages and [the counterclaim defendant's] actions"), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

[18] There is also evidence that Nephron distributed the "Opioid Free" product slick, which bore the "503B outsourcing facility" logo, to these customers' GPOs.  *See* Dkt. Nos. 160-2 at 20; 169-22 at 2–4.

of EXPAREL to RKK.  A reasonable jury could conclude customers purchased RKK because they believed it was Section 503B compliant, and that Nephron's sale of RKK to these customers captured at least some business that otherwise would have gone to Pacira's EXPAREL. Accordingly, summary judgment is denied on the injury element of Pacira's claim.

## IV.     CONCLUSION

Based on the foregoing, the court grants in part and denies in part the parties' competing motions for summary judgment (Dkt. Nos. 169, 170) and denies Defendants' motion to exclude Butler's expert report (Dkt. No. 163).  Count I and Dr. Worthington are dismissed from the case with prejudice.  The following issues relating to Count II remain for trial:

- Whether Nephron's use of the "503B outsourcing facility" logo was misleading;

- Whether the message conveyed by the "503B outsourcing facility" logo was likely to influence consumers' purchasing decisions;

- Whether the "503B outsourcing facility" logo actually deceived or had the tendency to deceive a substantial segment of its audience;

- Whether Nephron's designation of RKK as a "503B Product" and/or its use of the "503B outsourcing facility" logo proximately caused an injury to Pacira; and

- If Pacira was injured by Nephron's conduct, whether it is entitled to an award of actual damages and/or disgorgement of Nephron's profits.

**IT IS SO ORDERED.**

s/Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
August 6, 2026